Good morning, Your Honors, and may it please the Court, Sam Winson on behalf of Lola Kasali. Today I'd like to focus my argument on whether the District Court in this case abused its discretion by conducting the first day of trial in Ms. Kasali's absence. As this Court knows, the right to be present at one's trial is rooted in the Sixth Amendment's That rule is also codified by Rule 43 of the Rules of Criminal Code of Procedure. And the main case that we rely on today, among the many others that we cited in our brief, is the Beltran-Nunez case from this Court. And the Beltran-Nunez case said that to proceed to trial in a defendant's absence is a quote severe step. And the District Court's discretion to do so is narrow. And that's because the right to be present and to not be tried in absentia must be safeguarded, as this Court said in Beltran-Nunez. And this Court also said in the Alitbo case that the right to be present at one's trial is a fundamental right. Would you summarize, please, for the recording, everything she missed that first day of trial? I know voir dire was one element. What else did she miss? Sure, Your Honor. She missed the entire voir dire. She also missed opening statements, and she missed the first two witnesses of the government's case, so the entire first day of trial. The standard of review on this case is an abuse of discretion in terms of whether to proceed to trial in her absence. I know that there was some back and forth in the briefing about what standard we're under. I think just to be clear, the government cited that there was a clear error standard about whether the district court's decision . . . whether the district court's finding of a voluntary waiver, and that's true from the Davis case, but the decision to move forward with the trial in the defendant's absence, even with a voluntary waiver, is an abuse of discretion standard. And I think it's clear from the record that that was also an issue that the Court returned to many times and was contested by Ms. Casale such that this wasn't something that the district court didn't consider, such that it requires a lower standard of review besides abuse of discretion. So to be clear, are you saying there was a voluntary waiver? I am not, Your Honor. We contest that vigorously. But even if there was one, there still is an abuse of discretion standard about the decision to move forward in her absence and not weighing . . . you have to weigh the factors of the Beltran-Nunez . . . from the Beltran-Nunez case before you do so. And those factors are whether a slight delay could produce her presence, whether weighing that against the inconvenience to the jury . . . What evidence is there that a slight delay would have resulted in her presence? Well, because she . . . first of all, she was actually there. This isn't a case like some of the other cases we have where someone doesn't show up or they say I'm leaving. She was actually there. And also, she did end up attending the trial once it was explained to her that her rights were preserved on appeal. So I think that is evidence in and of itself, Your Honor. I would also point to the fact that she made many affirmative statements that she wanted to be present. Now, she was also stuck on the issue of her counsel, an issue we also raised in the brief. But she was making affirmative statements throughout the record that she wanted to dress out, I want to be present. Those are cited throughout the brief. And the district court, starting on the first colloquy before the voir dire examination takes place on record side, 962 to 967, it's only five pages, a very short colloquy actually. It couldn't have taken more than a couple of minutes. And there, the district court presents her with the option. She says, you've shown up in jail clothes, you need to be in street clothes. And you have two options. You can be here present in street clothes or you can sit in a cell and not be present. And the first two times he asks her that, she does not answer his question. But the third time that he asks her that, she does say on page 965 to 966, I want to dress out. And instead of accepting her answer, he continues to argue with her about the counsel issue. And then when he asks her defense counsel, what should we do, he says, let's proceed without her. Wasn't he talking with her about the counsel issue because she was continuing to bring it up? She was, Your Honor. She was. But the Beltran-Nunez case says you have to give the person a chance to be present. This is a fundamental right we're talking about. And you can't just proceed to trial in absence just because there's a small disagreement about one issue. Especially when it's something as critical as assisting your counsel in voir dire and also being able to assist your counsel and confront the witnesses against you for the first two witnesses of the case. Who were the first two witnesses? I believe it was a witness for the SBA, the Small Business Administration, and I'm sorry, Your Honor, I'm having a moment about the second witness. I can get to it in a second. Well, the SBA witness, was he in effect . . . he or she an expert witness in effect or just going over accounting matters? I believe he was going over the program and what the SBA actually did in this case in terms of the money. So she couldn't have helped her counsel with that? She certainly could have helped her counsel with any factual discrepancies about how the money was distributed to her or not based on what the SBA said. I thought you said he talked about the practices. Did he talk about the actual facts of the case? I believe he did, Your Honor, both. You worry me when you say believe. I'm sorry, Your Honor, that's just a poor choice of language. So you're sure he testified something, she could have said something to her, given some instruction to her counsel? Yes. Yes, Your Honor.  Did she end up going to a law clerk's office and watching it on or listening? Yes. She was brought to a law clerk's office to listen to the audio, but she did not have contact with her counsel at that time. Well, I understand that. But was there any contemporaneous objection made by her counsel to her being removed and sent up to the law clerk's office? No, there was not. Don't you think that weighs in on it? It's certainly a factor to consider, but I would also point out that the defense counsel in Beltran-Nunez also didn't object to his client not being present, and this Court still found that it was improper to move forward to trial without the defendant. I think one of the other things to also consider in this case is that the Beltran-Nunez case says that the inquiry must be made at the time when the Court makes that decision. In this case, we didn't have that. We had that first five pages of colloquy, and then the Court just pushed along. And then only on the third day, after the trial basically was over, did the government raise out of an abundance of caution, I think they were worried about this issue on appeal, to have the Court consider those factors more in detail. But this Court said in Beltran-Nunez that the validity of the Court's exercise of its discretion does not turn on whether subsequent events prove or disprove unsupported judgments. And so I think it's clear from Beltran-Nunez and from its progeny that you have to make that inquiry at the time, not after the fact. I think . . . You agree that the plain error standard applies to the determination about whether or not her right to be present was violated. Are we reviewing that under plain error? You are, Your Honor. So, it's going to be necessary to show that there was some prejudice, that her absence somehow affected the outcome. Right. And I would point to the Alicpo case that said because this is such a fundamental right, these constitutional rights, that we can . . . there is a presumption that she was harmed by this, and that we don't have to have this entire proffering of exactly how she was harmed The Court certainly didn't require that in Alicpo, Your Honor. And I think that that's exactly what the Beltran-Nunez case is getting at when it's talking about these factors is, on the one hand, we have to allow a district court judge to have the power and the discretion to have control over his courtroom, but it's not an unlimited power, and it has to be weighed against a defendant's right not to be tried in absentia. That's something that this Court and all of our courts have frowned upon throughout the years. And before we take that severe step, there has to be this weighing of factors, and that simply didn't happen in this case. Well, Counselor, how much weight should we give to sort of the back story on this? This district judge, very experienced, had been dealing with the difficulties presented by this defendant for more than just one particular hearing, correct? That's correct, Your Honor. And how should we, how would have been proper, how would it have been proper for Judge Lake to have considered this past recalcitrance or whatever gentle word I should be using, difficulties that she was presenting to the Court and sort of evaluating, here we go again, on this fairly simple matter of how you get dressed, how you will present yourself out in front of the jury, I would be very surprised if a district judge wouldn't be considering that history. He absolutely can and should consider that, but I think, Your Honor, what was missing here is at least a basic warning that if you understand that you have the right to be present and if you do not answer my questions, you will be removed. He didn't say that. This is sort of like the old saying, no good deed goes unpunished, because it would be very prejudicial for her to be sitting there in her orange jumps and orange prison clothes. He's trying to help her. In any way, have you thought of that second witness yet? I haven't, Your Honor.  I've been nervous. I'm going to put it on your rebuttal. Yeah. The other reason that the District Court mentioned in this case, so he mentioned two. It was very brief until, again, that final on the third day when they considered it after the fact, is that he was concerned that she might cause a disruption, so that's a slightly different analysis. It's still an abuse of discretion, and the lead case on that, which we cited and the government cited as well in their brief, was the Hill case, and essentially that case says after warning that removal is a consequence and the defendant continues to act in a manner that's, quote, so disorderly, disruptive, and disrespectful of the court that her trial cannot be carried on without her in the courtroom, then the defendant can be removed, and that's also codified in Rule 43. I think it's clear from the record that the defendant was being obstinate and arguing with the court about her right. I don't think that that rises to the level of disruption, and I certainly don't think she was warned about a disruption before she was swiftly removed in that initial colloquy. She was given a choice about what would you like to do, but she wasn't warned that if you interrupt me, then you'll be removed, and I think had the court done that and said, I'm going to take a slight recess, you need to consider this because you have a fundamental right, even if it's fifteen minutes, I mean, if we look at the other cases where there was a recess given, in the case where, I believe it's the Davis case, and that was ruled to be valid to continue without the defendant, they took a two-day recess, and I think here, to simply just send her back and say you need to go think about that, or advise her counsel, tell her family who was there, go talk to her, she has a right to be present, I think any one of those things would have satisfied the Beltran-Nunez factors, but he just, after one question to the defense counsel, what do you want to do, let's proceed without her, who she was already in disagreement with, and then he sends her out, I think that's what this court required in Beltran-Nunez to avoid. So, do you plan to talk about restitution, that you plan to address that? I can briefly address it, your honor, I think we did address most of what I would like to say in the briefs, but to just briefly touch on that issue, I don't think that the SBA qualifies as a victim, or that it was a pecuniary loss, and I do think that, although the government has cited some cases about district courts not being able to weigh in on the double recovery issue, I do think that that is something that this court should consider, because Ms. Casale never received a single penny of this money that she actually used, it was seized . . . But the bank did. The bank did. The bank did. Is there anything in the record the bank returned the money to the government? The government's, the money was seized by the government. Correct. But the bank didn't return it to the government. It was seized by the government. Correct. How long was the delay between the funds were dispersed to the bank, and when the bank and the government had to seize the money? I believe it was almost immediately. All right, counsel. Thank you. Mr. McHale. Good morning, Your Honors. May it please the Court. Scott Misler on behalf of the United States. I'll try to proceed in the same order that my colleague has, addressing first Ms. Casale's absence from the first day of trial, and then turning to questions about restitution if the Court has them. And on the first issue, I want to clarify for the Court, I guess, two main points. One that Judge Southwick raised about the backstory here, and the second one being the question about the standard of review. Under any standard of review, any of the ones we've discussed today, they're highly deferential to the district court, whether the Court concludes here that Ms. Casale failed to preserve these issues and therefore plain error applies, or whether the Davis case and the Hill case governed and were under clear error or abuse of discretion, those are highly deferential, and the district court here, as Judge Southwick pointed out, had extensive experience and extensive dealings with Ms. Casale. And so I want to start out with that. Secondly, my opposing counsel started out with the Beltran-Nunez case, and I want to clarify, Your Honors, that there are two distinct bases for finding a proper waiver of the rights of presence under Rule 43. The first one, under C-1 subparagraph A, Rule 43, C-1A, refers to the voluntary absence of a defendant. That is the situation. You're referring to it, and it says, after the trial has begun. Isn't that what it says? It is, Your Honor, yes. Is that what happened here? We think so, and I think this Court has not decided that issue, but we think analogous cases from, in particular, the 7th Circuit and the 11th Circuit have held that in a situation like this, where a court has indications that a defendant may not be present or may be disruptive and holds a proceeding immediately before voir dire is conducted, on the day jury selection is set to commence, the trial has begun for purposes of Rule 43. The trial has begun before voir dire begins? Yes, for purposes of this rule, that's how the courts have concluded it. When does jeopardy attach? It attaches when the jury is sworn, and this Court in the United States v. Kraut, which is a 1995 decision of this Court cited by both sides, Kraut held that the Rule 43 analysis of commencement of trial is different than the double jeopardy analysis, and relied on the line of cases going back many decades, where courts had held that trial begins, a defendant is initially present under Rule 43, and I think this is the phrase, when the work of empaneling the jury begins, and that's kind of an ambiguous phrase, Your Honor. I think the Court had basically said it would defeat the purpose of this rule, and I think as some of the questions from the bench indicate, it actually would be more prejudicial to a or it presents a risk of disruption, into the chamber, into the courtroom, to be before jurors, to have that one outburst that may basically create a bell that you can't unring, essentially, and then just to present the defendant there, say, Now trial has begun, remove the defendant, start again. So I think the courts have tried to look at this in a practical way with the purposes of the rule in mind, and I'm not aware of any case law that goes the other direction. So we think a defendant was initially present, trial had begun under that soundly reasoned line of out-of-circuit cases, and then the question the Court has to address is which provision of the rule are we under? And I think, just to circle back to opposing counsel's argument, the reason the judge didn't, I think, spread on the record the Beltran-Nunez findings immediately was because the parties were treating this as a, under the other provision of the rule, a disruptive, defiant defendant, and the Court made that clear, I believe, at page 1108 of the record, by citing to Illinois v. Allen. That's the leading Supreme Court decision on consummationist defendants who were removed from their trial. And then, again, at record starting at ROA 1372, that's when the Court did make the Beltran-Nunez findings expressly, but did so because the parties, the government explained at that point the parties were treating this as a disruptive defending case, and I think opposing counsel's right. The government anticipated that Ms. Casale might raise this issue on appeal and said, Your Honor, can you clarify, if a reviewing court were to look at this case, not under A1C, not under the disruptive defendant provision, but instead as a voluntary absence, what were you thinking? What were your findings? And so I agree with counsel, Beltran-Nunez does say at the time, but I guess I would analogize this, Your Honor, to how the courts treat the Speedy Trial Act. In Speedy Trial Act settings, when the courts grant ends of justice continuances, what the Supreme Court has held is basically it's important the judge have the right considerations in his or her head at the time, even if they don't memorialize that in the record until later. And so here I think I would point the Court specifically to page 960 of the record. That's immediately after the marshals informed Judge Lake that Ms. Casale was refusing to dress out and that she said that she, quote, did not want to participate in trial. And at page 960, when defense counsel raises the prospect of a mistrial, I'm just trying to get the exact citation, Your Honor, but the Court says essentially that, I'm just going to try to read the Court here, mistrial will be no good. And this is 960, line 15. She has exhibited the same conduct for months. There's no likelihood that if we granted a mistrial, brought her into the jury panel, or even gave her new lawyers, that she would be more cooperative. So to your point, Judge Graves, I think at that moment, Judge Lake had in his head the Beltran-Nunez factor of, can I reconvene this trial immediately and get this going again? Or if I do suspend the proceedings, is it likely I can restart them successfully? And Judge Lake's conclusion at that moment was no. And that, I think, goes to your point, Judge Southwick. He had extensive experience dealing with this defendant over many months, including ex parte proceedings with her and her counsel. So those, I think, his findings there and his judgment there should be reviewed deferentially, whether the Court views it as preserved, the claim is preserved or not. Judge Barksdale, you asked about what Ms. Casale missed from them. She missed the first, she missed Ms. Voiradier. And I did want to mention to the Court that it was not just this five-page segment that opposing counsel mentioned. After Voiradier, Judge Lake reconvened with the lawyers in the Court conference room where Ms. Casale was told that she could listen to the proceedings, and again asked her if she wanted to come back in. And that's what the Court made at ROA 1012, the finding that she had voluntarily waived her right. So he did not just leave it as that. He returned again that afternoon. She again said she was defiant and again refused to enter the courtroom with her current lawyers. And then the judge tried again the next morning. Lengthy proceedings where even her lawyer said, Your Honor, you've given her all the rope she deserves. And the judge said, no, let's try again, one more time, and finally explained to her, as counsel indicated, that she preserved her claims. That's the second time that she'd been told that she's preserved all her objections to counsel. And then finally, she went in. So I think Judge Lake really tried here. This was not a situation where she was being cavalier. He was trying to induce her to go in. Sometimes the exchanges were short because of the back story and lengthy proceedings. And that, I think, also ties in directly, Your Honors, to the arguments opposing counsels made about the sufficiency of the warning. We argued in our brief, and I think counsel has not addressed today, the interaction that Ms. Casale had with the Court at the November 19, 2021 pretrial conference. When she spoke over the Court at that conference, Judge Lake said to her, do you want me to remove you? I can remove you. You keep talking over me. I can't. I'm trying to listen to you, essentially. And then moments later, when she again interjected at the open portion of that hearing, Judge Lake said, I'm going to pause here. I want to remind you, and warned her explicitly on the record about the risks of being obstructive at trial. So I would acknowledge, Your Honor, that the judge didn't give a Miranda-type warning to her and said, if you do this, if X, then Y, but I think if you combine his interactions with her at the pretrial hearing, and then you look to pages like 964 of the record, Your Honor, where this is after the marshals have told Judge Lake that she won't enter the courtroom. He is asking her a direct question. It's not just, what about your clothes? This is 964, 965. Do you want to go upstairs, put on street clothes, come downstairs, and sit with your attorneys during jury selection? Or do you want to remain in the holding cell while we pick the jury without you? It was quite clear from that either or that the consequence to her of not going into the courtroom with her assigned attorneys would be that she would not be able to participate in the trial. So could the judge have done it more clearly? Absolutely, but in the rough and tumble of a trial setting, we don't think more was required, especially given the deference that the judges owed. And I apologize, I didn't answer your question, Judge Barksdale. So the first two witnesses that day were, indeed, a lending specialist in the Small Business Administration, and the second witness was from Radius Bank, which was the first bank victim. It was the bank from which she actually got the funds. As you'll recall, Your Honors, Ms. Castelli . . . did you have a question? But the first . . . she tried to get two loans, only one of them was successful. Radius Bank was the one that did disperse the funds. And just looking toward Your Honors' questions about restitution, this is what happened. Ms. Castelli did obtain the funds from Radius Bank, which was a lending institution approved by the Small Business Administration. Radius Bank dispersed the money to Chase, which is where Ms. Castelli had accounts. She opened four new accounts to basically spread that money out among the accounts. Shortly after she did that, and before she could withdraw the funds for personal use, the government obtained a seizure order and seized the funds. Now . . . In the lapse of time from when the funds were first dispersed to the first bank to old Chief, the government seized them. I don't know that the record gives you the answer. I think, like counsel said, almost immediately. She did not have a chance to spend the money, that is true. But I think that's why we take a step back and look to this court's cases about forfeiture and restitution. Forfeiture is about punishing the defendant for illicit gains and making them disgorge those gains. Restitution is about compensating victims. And so, as Your Honors have pointed out, the SBA was left holding the bag here. The Small Business Administration did have to reimburse Radius Bank under the terms of the Paycheck Protection Program, and I think the government submitted at ROA 2136 to 38 documentation from the Small Business Administration explaining how they had paid, how and when they had paid that money out. So, by the time the sentencing hearing in this case took place, the Small Business Administration was out over $2 million, the $1.95 million from the loan plus extra fees and interest, and that's what the district court ordered. And it's not . . . I'm sorry, Your Honor. I guess my southern ear is not moving as fast as you're speaking, but the SBA had to pay the bank. Yes. So, the bank used its money to put into the account, and then the SBA gave the bank that money back even though the money never left the account? There's two banks involved. I think that's where the confusion may be coming from, the fact that there's two banks. So, the Paycheck Protection Program, this was a COVID-era program that Congress basically gave money to the Small Business Administration and said, Help our small businesses survive this period by calculating loans, basically guaranteed loans, right, that banks aren't going to want to lend money to small businesses that may not survive COVID. So, what are we going to do? We're going to tell the banks, if you give out this money to qualifying customers and they use it for permitted purposes of paying payroll and associated business expenses and they fail anyway, we'll guarantee it. We, the government, will guarantee this so you banks won't be hesitant at the time to do that. And so, there's two banks involved here, Your Honor. Radius Bank is the lender in this case. Chase Bank is Ms. Casale's bank. So, the money goes from Radius Bank, the lender, to Chase Bank, Ms. Casale, but right before Ms. Casale essentially has a chance to put the money from the bank account into her pockets, the government seizes it. The criminal authority seizes it. And so, what Judge Lake recognized here properly under this court's case law, it may just seem like a paperwork requirement, but he properly recognized that under the way the government allocates forfeiture funds, allocates seized funds, having the restitution order in hand basically gives the Small Business Administration a priority over other potential victims. So, it really is kind of a paper requirement to let the Small Business Administration move ahead in the line so the government doesn't just take the money to the ATF to hire more agents. I'm just giving an example, for example. Instead, the money would go to the victim. And if the forfeited funds are used to compensate the SBA. Who's the victim? The victim here is ultimately the Small Business Administration because they are the entity that is out the money. Recall, Your Honor, that they have repaid the lender. The government seized the money. So, there's a different pocket? Correct. To put the money into? Yes. Exactly. It's criminal authorities and it could be the... I really want to know where it ended up. I don't know where the money is sitting today. Most of the money that is seized via forfeiture order goes into something called the Asset Forfeiture Fund. Government lawyers call it the AFF. A-F-F. And this is explained, Your Honor, in this court's decision in United States versus Sanjar, which is cited in our brief, S-A-N-J-A-R. Judge Costa's opinion there explains for the court. Look, and Judge Lake said this, superficially, this may seem a little silly, but basically Congress has made these two forms of financial penalties mandatory under the statute. The government has tried to work with this and make sure that they're not overly harsh by crediting against restitution obligation forfeited funds. So, if this process plays out as it's anticipated and as the court described it in the Sanjar opinion, the money will go from the one pocket, one bucket of government funds, excuse me, to the SBA, pay them, make them whole. And Ms. Casale is no longer on the hook for the money. That's how it works. And I think the government explained this to Judge Lake in its briefing. He said he'd carefully read the government's pleadings. And those were, Your Honor, at 1448 to 1449 of the record, where the government laid out this whole process for the court. And so I think he made the very educated, reasonable judgment. I'm going to follow precedent. I'm going to let the process play out and expect that if it plays out correctly, Ms. Casale won't be left with a $2 million bill, even though the government still has the money. That's basically how it plays out. Well, counsel, you've done an excellent job of explaining the way the government works, which you wouldn't necessarily expect should be the way the government works. But I'm looking at your brief now. Is there, you referred to a case, and maybe I just didn't hear the name. Is there a case, either from this circuit or elsewhere, that actually approves what you just described to us as a justification for restitution? Yes. I think I'd rely on Sanjar, Your Honor. Say that name again. Yes, Your Honor. I'm just going to try to find where we cited it in the brief. It's in a footnote. It's in a footnote on page 51 of our brief, S-A-N-J-A-R-8-7-6-F-3-7-25. And that, I believe, was a government cross-appeal where the district court had declined to order restitution or had ordered an offset. And I believe this court's opinion said that the court lacked authority to do so. Both of those financial sanctions are mandatory under the statute. And the way that they're reconciled is through the mechanism that I hopefully tried to explain to the court, that the government has to allocate forfeited funds internally. There's a process laid out in the Code of Federal Regulations, in the Offset Forfeiture Manual, that is available on the Department of Justice website. This court in Sanjar cited all those authorities and said, essentially, we expect this to play out as it's described, but the Congress has left it to the executive branch to work out the details here, and we're going to entrust the executive to do so. So I think Sanjar resolves that. And I think – sorry, Your Honor. Well, I was going to say, and as you point out in your brief, she never claimed that the SBA was not a victim. That's correct, Your Honor. I do think that is another area where the standard review comes into play. We believe that under this court-settled case law, when a defendant raises one ground for an objection in the district court and then changes the argument on appeal, plain error review kicks in. And so I think the court doesn't have to go down this road because it's enough to say that under either of the theories we've given to the court, the SBA is a direct victim or the SBA is due compensation as an insurer, as a guarantor under 18 U.S.C. 3664J. Either one of those theories, both of them are backed up by the case law, and I think Ms. Casale hasn't really challenged – the second one hasn't really challenged the 3664J argument that we've made. So under either of those theories, Your Honors, we think that the restitution award should be affirmed. I'll just mention quickly – I've moved off it – but, you know, on the question of prejudice, Your Honors, if the court has to reach that on the right to presence issue, that's one where I think the standard of review and the burden of proof could matter. The Leekbo case that opposing counsel cited is a case where the claim was deemed preserved, so the government bore the burden of showing that any error was harmless, whereas in some of the cases that maybe Judge Graves had in mind, like United States v. Thomas, that was deemed to be plain error, the defendant bore the burden there. And I think especially if this court is placing the burden on Ms. Casale, it's ridiculous just to say, well, this X, Y, and Z could have happened. She's had ample opportunity here through counsel and through a review of the complete district court record to explain how she would have assisted counsel at counsel table. As Your Honors mentioned, she did have a chance to listen to the audio feed, and she's claimed on appeal and some pro se filings that she couldn't hear all of that. Maybe so, but the district court at page 1012 of the record asked the marshal who was accompanying her, can you hear and hear? He said, yes. So what we know is that at least for part of the proceedings on the first day, she could hear, and she still hasn't identified any line of questioning that her counsel failed to pursue of those first two government witnesses. As to voir dire, she has highlighted one juror who used to work in law enforcement. But I guess two points about that is, one, her counsel was given an opportunity by Judge Lake to directly question that person. We don't actually know if that juror was seated. The record doesn't, to my mind, reveal that. And secondly, under the Thomas case that we've cited in our brief, merely saying, well, I actually would have asked my counsel to strike that person wasn't held to be enough, because even changing the composition of the jury wouldn't necessarily have changed the outcome. So we think if the court does apply plain error under Thomas, she hasn't met her burden. And if we bear the burden there, I think for similar reasons, we would point to the absence of any concrete arguments about how she would have assisted counsel at trial. If the court has no further questions, we would ask that the judgment be affirmed. All right, counsel. I don't think I'll take the full five minutes, Your Honors, just briefly. Judge Barksdale, just to confirm, that second witness was from the lending bank, Radius Bank. His name was Danny Kim. And he did testify to the facts of the case. Just briefly, on standard of review, on the right to be present, we disagree that it's clear error across the border that it wasn't preserved. Beltran Nunez says that it's a narrow discretion, meaning abusive discretion. And in that case, there wasn't an objection made by defense counsel, and it was still abusive discretion standard. And I also think that this issue was brought up repeatedly throughout such that it was preserved in a way that's different. If you look at the Thomas case, which my colleague on the other side pointed out, in that case, the defendant only missed a small portion of when they were actually doing peremptory and cause challenges, but was able to confer with his counsel before and after. Totally different from this situation where Ms. Casale missed the entire voir dire and the first two witnesses of the case. On the forfeiture issue . . . Again, there's no statement of prejudice by defense counsel. By trial counsel. Sir? You mean by . . . By trial counsel, yes. That's correct, Your Honor. Such as a voir dire, she could have helped with this. On this first witness, she could have told me that. And on the second witness, she could have told me this, that, and the other. I mean, there's none of that.  But she, herself, was concerned that it was a narrow discretion. that she wanted to be there. On the forfeiture issue, again, I just point out, we don't think that the SBA is actually a victim, as that term is defined, I believe. But the government says you never made that claim at sentencing. Trial counsel, I was not trial counsel, but that's true. You know, whenever an appellate counsel has to concede something, he always points out he wasn't trial counsel, but you are representing the defendant here now. There was no objection made at sentencing. But, you know, that's their claim.  And I just want to point out that the SBA is the only company that has ever made a claim about the SBA being a victim. Is that correct? That's correct, your Honor. I would point out that had it had the government offered a lending bank or someone else who may have received the funds in the alternative, they might be able to be considered a victim, but we don't believe that the SBA is, because they would have spent the money anyways. And I do think that there is just something unsavory about this, about holding Ms. Casale responsible for restitution when she didn't actually receive any money. For all of those reasons, and especially because of the sacred right to be present at trial, we'd ask that this Court reverse the district court's decision. Thank you. All right, counsel. Thanks to you both for helping us with this case this morning.